The DETROIT BANK AND TRUST CO.
OF DETROIT, et al., Plaintiffs,

v.

The TRUST COMPANY OF the
VIRGIN ISLANDS, LTD., et
al., Defendants.

Civ. No. 78–1400 HL.

United States District Court,
D. Puerto Rico.

June 7, 1985.

Francisco M. Troncoso, Fiddler, Gonzalez
& Rodriguez, Old San Juan Sta., P.R., for
plaintiffs.

Adam Starchild, Tarpon Springs, Fla., for
defendants.

OPINION AND ORDER

LAFFITTE, District Judge.

SUMMARY OF PROCEEDINGS

This action was instituted as a diversity action on July 21, 1978, by Francis D. Shelden and L. Bennett Young, as settlor and protector, respectfully, of the Francis D. Sheldon Revocable Inter Vivos Trust, against the Trust Company of the Virgin Islands, Ltd., and its director, Adam Starchild. The action is essentially one seeking relief in the form of an accounting of trust assets by defendants, and liability for breach of trust in the handling of trust assets by defendants. Jurisdiction was sustained by this Court by opinion and order of January 15, 1979. L. Bennett Young and The Detroit Bank and Trust Co. of Detroit, Michigan[1] were added as party plaintiffs in their capacity as successor trustees of the Trust. (See Opinion and Order of Judge Cerezo, April 5, 1982.) The litigation has followed a tortured path, including many volumes of discovery motions.

In mid–1983, this Court granted defendants' attorney leave to withdraw as counsel. On September 7, 1983, the Court granted defendants 30 days to notify the Court of new legal representation, and 20 days to comply with a previous discovery order. On October 31, 1983, defendants were granted an additional 15 days to comply with the Court's orders. The defendants failed to comply, and the Court entered default against both defendants.

Hearing on default was originally scheduled for February, 1984, but upon the motion of Mr. Starchild it was continued sine die. Mr. Starchild represented to the Court

1. The Trust Co. later changed its name to Comerica Bank-Detroit, and is now properly known    by this name.

that he was involved in an involuntary bankruptcy proceeding in the Middle District of Florida, and could not properly respond. Upon stipulation of the plaintiffs and Adam Starchild, pro se, before the Bankruptcy Court in Florida, this Court vacated the entry of default as to defendant Adam Starchild, individually, and a pretrial was held in October, 1984. The case finally came on for hearing in February, 1985, at which time defendant Trust Company of the Virgin Islands, was tried in default, and defendant Adam Starchild fully participated, pro se.

Upon examination of all of the documentary evidence presented at trial, and upon careful consideration of all testimony presented by live and by deposition, the Court makes the following

### FINDINGS OF FACT:

On or about September 28, 1976, defendant Adam Aristotle Starchild (Starchild), the name chosen and adopted by one Malcolm Willis McConahay (Starchild's deposition, hereinafter "Star. Dep.", p. 39), entered into a trust agreement, on behalf of defendant Trust Company of the Virgin Islands (TCVI), with the settlor of the trust, Francis D. Shelden (Shelden), then a resident of the State of Michigan, under which TCVI was to act as trustee. The trust is revocable, and under its terms, Shelden is the sole beneficiary during his lifetime. Upon Shelden's death the assets of the trust, if still in effect, are to be distributed to the children of Shelden's brother, if his brother had predeceased him. The Trust Instrument provides that the income beneficiaries and Shelden can, by instrument in writing delivered to the then acting trustees, remove the trustee and replace it with a Successor Trustee, and Shelden could amend the Trust. On or about the same time he executed the trust instrument, Shelden, by a further instrument, appointed L. Bennet Young, Esq. (Young), a member of the bar of the State of Michigan and practicing in Michigan, Protector of the Trust, having the power,

*inter alia,* to remove the trustee and appoint a new one.

Shelden discussed with Starchild the obligations and responsibilities of the protector of the trust. According to Shelden, the Protector of the Trust was to have substantial authority, including the power to remove a trustee.

The Trust Instrument provides that the settlor or any income beneficiary can have access to the books and records of the trustee and the trustee should account, at least on an annual basis, for all receipts and disbursements made.

Attached as a schedule to the Trust Instrument is a list of securities, with a grouping at the top which Shelden identified as a list of the common stocks he held at the time that the Trust Instrument was executed and which were placed in the Trust. There were also shares of closely held companies which were also made assets of the Francis D. Shelden Trust. Shelden's assets consisted largely of shares of common stock listed on the New York Stock Exchange. These shares came to Shelden via inheritance from his grandfather and the bulk of them, in value, had a very low tax basis. Starchild believed that the shares of common stock had an aggregate market value of $1.7 million dollars at the time they were placed into the Trust. Shelden understood that, at that time, they were worth between one and a half and two million dollars. However, a financial investments expert who testified at trial stated that they were worth in excess of $2.4 million dollars.

Through closely held corporations established by him, Shelden also owned real estate consisting of the following: (a) a house in Aspen, Colorado, held in Windigo Ranch, Inc.; (b) half an interest in a property located in Charlevoix County and held in FDS Land Co.; (c) a condominium in Ann Arbor, Michigan, which was held in his name; and (d) North Fox Island, held in North Fox Island Company.

Because of his preoccupation with his tax exposure on any sale of the New York Stock Exchange listed shares, Shelden had

an understanding with Starchild and the TCVI that none of these shares would be sold without Shelden's specific authorization, and Shelden agreed with Starchild that the administration of the trust was to be operated in consultation with Shelden and his office in Detroit.

TCVI is a company formed under the laws of the British Virgin Islands (BVI) by Starchild in September of 1976, for the purpose of acting as trustee as set forth above. At least as of 1982, the only shareholders and directors it had had were Starchild and one Frank James Holahan (hereinafter Holahan). However, Holahan was not present at the first meeting of the board of directors, which was held in Tortola, BVI.

Holahan was a college student who was following Starchild's orders, and was "going along for the ride" and "expenses" and director's fees, who spent a considerable period of time staying with Starchild in Starchild's various apartments. Further, at least as of 1982, the sole business of the TCVI was acting as trustee of the Shelden Trust and purportedly managing the trust's assets.

Although the trust agreement does not so provide, Shelden stated that Starchild agreed to provide quarterly audited reports on the activities of the Trust. In any case, by the middle of 1977, the TCVI had provided no audited reports, and at such time and thereafter failed to provide any reports or accountings at all. In addition, the TCVI failed to provide any accounting information required for Shelden's 1977 tax returns and those to be filed thereafter.

Shelden, living in The Netherlands by 1977, consulted an experienced lawyer admitted to the bar of The Netherlands, Antoon Kasdorp (Kasdorp), who specialized in international tax matters. Kasdorp was advising Shelden on his tax matters and also as to his problems with the TCVI.

During one of the meetings he had with Shelden in the latter part of 1977, Kasdorp and Shelden spoke on the telephone with Starchild and discussed with him the receipt of a proper accounting, the removal of the TCVI as trustee and the appointment of one Dr. Edward Brongersma ("Brongersma") as Successor Trustee. During the telephone conversation, Starchild was very evasive and did not respond to any direct question. Accordingly, Shelden thereafter determined to remove the TCVI as trustee.

By instruments dated April 13, 1978, and entitled "Removal of a Trustee and Appointment of a Successor Trustee" and "Acceptance of Appointment of Successor Trustee", Shelden, acting in accordance with the powers that he had pursuant to the Trust instrument, removed the TCVI as trustee and appointed a Dutch attorney, Dr. Edward Brongersma, as successor trustee. Kasdorp served the instruments on Starchild during a meeting with him in New York City on October 20, 1978, and mailed a copy to the registered office of the TCVI in Tortola, BVI. Starchild and the TCVI refused to provide the statement and accounting and refused to turn over the assets to the successor trustee, Dr. Brongersma. Kasdorp sent the removal and appointment documents to the accountants of the TCVI by registered mail.

By instrument dated October 16, 1979, Young, as Protector, subsequently removed Dr. Brongersma as trustee and substituted himself and The Detroit Bank & Trust Co. as successor trustees. By instrument dated November 13, 1979, Shelden acknowledged and affirmed said substitution of trustees. Young and The Detroit Bank & Trust Co. (now known as Comerica Bank-Detroit "Comerica") accordingly are, and have been since October 16, 1979, the trustees of the Trust.[2]

Wind, of Comerica, and Young have represented and testified that until and unless

---

**2.** The issue of the identity of the successor trustees of the Trust was decided in other litigation in the E.D. Michigan, cases numbers 82–1737 and 82–1905, wherein Judge James held that L. Bennett Young and the Detroit Bank and Trust

Co. were the lawful and proper Second Successor Co-Trustees. This finding was later affirmed by the Court of Appeals for the Sixth Circuit in *Nat'l. Bank of Detroit v. Francis D. Shelden,* 730 F.2d 421 (6th Cir.1984).

Shelden returns to the United States, and resolves the criminal complaints against him, he will receive no part of the income or principal from the Trust.

During the above mentioned meeting between Starchild and Kasdorp in New York City during April of 1978, in which Kasdorp served the above described removal papers upon Starchild, Starchild stated that the TCVI would not render an accounting. No such accounting has ever been received. Starchild further stated that the Trust assets would not be turned over, and none within TCVI's or Starchild's control has been turned over. This lawsuit then ensued. Through other litigation brought in the United States District Court, Southern Division of the Eastern District of Michigan, Action No. 79–60003, before the Honorable Charles W. Joiner, the plaintiffs herein have obtained control of the shares of the private companies which owned real estate.

As of April of 1978, most of the Trust assets were in discretionary brokerage accounts in New York at Bear, Stearns & Co.; Donaldson, Lufkin & Jenrette, Inc.; Ivan Boeskey & Co., and Shearson, Hayden Stone (now Shearson/American Express). Fearful of their being attached by the new trustee seeking to recover the Trust assets, Starchild caused the accounts, some time between April and June 1978, to be liquidated and removed.

At the time he caused said liquidation, Starchild stated to Holahan that he, Starchild, needed the trust assets to live on, and that the assets would not be returned to the Trust. Starchild then caused the proceeds of the liquidations, said by him to total about $1.4 million, to be sent through diverse jurisdictions and under various forms, into entities formed and controlled by him, along with Holahan.

The trail, in as skeletal form as possible, as recounted by Starchild, Holahan, and one Samuel Glasser, discussed below, was as follows:

Securities belonging to the Shelden Trust, worth approximately $1.7 million, were transferred on or around December 15, 1977, by Starchild and the TCVI to Minerva Investments, Ltd. (Minerva). Minerva was a company with offices in Hong Kong, and at the time of the transfer, Starchild was a director of both Minerva and the TCVI. Minerva liquidated the securities in May or June of 1978.

The proceeds of the liquidation were paid to TCVI and turned over to Minerva. These proceeds amounted to the sum of $1.4 million, and were paid by Minerva into a daily money fund account at Gradison Cash Reserves, Inc., in Cincinnati, Ohio. Adam Starchild was the signatory of the account.

The funds were then loaned by Minerva to Eleuthera Anstalt. Adam Starchild was the owner and sole stockholder of Eleuthera Anstalt. Of these funds, $800,000.00 were transferred from Eleuthera to Sogo Shosha, Ltd. (Sogo) as capital investment ($500,000) and as a loan ($300,000). Sogo was a company which was wholly owned by Eleuthera Anstalt, which in turn was owned by Starchild.

Further, approximately $200,000 was invested by Sogo into Volume Trading Co., and the balance of the funds transferred to Sogo went into brokerage houses. The brokerage accounts of Sogo were at Donaldson, Lufkin & Jenrette ("Donaldson", Account No. 044–99908–2–9), and Bear, Stearns & Co. ("Bear", Account Nos. 32–17935 and 040–35636–0–4). These were two of the three brokerage accounts which were attached and eventually released in the litigation in New York in 1980.

The Donaldson account was originally opened in the name of Hiatus Ltd., the name of which was changed to Sogo Shosha Limited sometime between November of 1978 and December of 1980.

The Donaldson account was opened in November of 1978 with a check for the amount of $300,000. The monthly statements on this account were sent to Sogo Shosha Limited in Hong Kong, and a copy was sent to Minerva Consulting Group in New York, in the care of Samuel Glasser.

A check in the amount of $278,240 was issued to Sogo in April of 1980. Sogo's account at Donaldson was liquidated in April of 1980, and in May of 1980 there was a balance of $592.95 in the account.

Bear account number 032–17845 was opened in January of 1979. By the end of January of 1979, the customers' cash account had a balance of $170,851.75, and there was an additional balance of $175,000 in U.S. Treasury Bills. In the margin account there was a debit balance of $199,067.82. The monthly statements for this account were sent to Sogo Shosha Limited in Hong Kong, to Sogo Shosha Limited and Minerva Consulting in Florida, and to Sogo Shosha and Minerva Consulting in New York. The account was liquidated in April of 1979 and closed in December of 1979 because there was a balance of zero in the account.

The liquidation checks were sent to Sogo Shosha Limited in care of Minerva Consulting, 200 Park Ave., to the attention of Samuel Glasser, and to Hong Kong & Shangai Bank to the account of Sogo Shosha.

Bear Stearns account number 040–35637 was opened in October of 1978, and for this month the credit balance was for $300,000, and the management account had a credit balance of $24,857.10. The brokerage firm of Bear Stearns did not have discretionary powers on this account, as these powers were held by Adam Starchild, who was the person placing orders for the account and was the managing director of Sogo Shosha. The monthly statements for the account were sent to Minerva Consulting and to Sogo Shosha in Hong Kong, to the TCVI, Minerva Consulting in New York. They were also sent to Sogo Shosa, Ltd. and Minerva Consulting in Florida, and to Sogo Shosha/Minerva Consulting in New York. The liquidation of the account occurred through a check made out to the order of Sogo Shosha in Hong Kong, for the amount of $83,113.83 on April 11, 1980.

Out of the proceeds of the liquidation made on December 15, 1977 by Minerva, the sum of $200,000 was transferred from Sogo Shosha through Atlas Financial Services Group, a Hong Kong company previously called Farsee Finance, to British American Trust Co. (BATC) and invested by BATC in a brokerage account at Shearson, Hayden, Stone, (Accounts Nos. 021 99502, and 020 91452). The account at Shearson was opened with stock and some cash, and the stock was sold by a broker in San Francisco, which generated as much as $150,000, and was deposited in the account in December, 1978. Shearson sent two monthly statements on the account: one to the principal offices of BATC and one to Minerva Consulting Group.

Mr. Werner Mendel, of Shearson, stated that they had no discretion in trading the account and they did not have written authorization to do so. In order to conduct a trade, Shearson had to contact a San Francisco broker, who in turn checked with the principals who had the authority to initiate transactions in the account. Mr. Mendel spoke to Mr. Glasser more than ten times, and with Mr. Starchild at least six times.

Mr. Mendel did not have any conversation with Mr. Glasser or with Mr. Starchild after November 7, 1980. On that date, a check in the amount of $234,569.17, identified as check No. 15914294, was drawn out of the account and paid to BATC and to Mr. Anthony Lederer, who was the counsel for Starchild and the TCVI in New York. Before that, a check in the amount of $5,000, check number 2111949A, was issued on September 14, 1979, and another check for the sum of $29,500, check number 15906893, was issued on January 20, 1980, and both were made out to BATC.

Another of the names that BATC used was Minerva Consulting Group, and Glasser and Starchild were the owners and advisors of BATC.

The Shearson account was part of the brokerage accounts attached and eventually released in the New York litigation. When released, a part of the money was spent to fund legal expenses involving the TCVI in Detroit.

Accordingly, as of April, 1980, Sogo and BATC had their money, between $500,000 and $1 million in the aggregate, in brokerage accounts in New York, at Bear, Stearns & Co., Shearson, and Donaldson, Lufkin & Jenrette.

While the use of the Trust assets to purchase a Florida home for Starchild, and the seemingly furtive means of transfer involving exotic jurisdictions, frequent name changes, and tiers of subsidiaries, would appear in and of themselves to bespeak otherwise, Starchild says, as stated above, that the transfer from TCVI as trustee to Minerva was in the form of an unsecured loan from the Trust to Minerva per oral agreement with Shelden, who agreed to it for U.S. tax reasons after consulting Shelden's tax advisor.

Shelden strenuously denies ever entering into any agreement to have his Trust assets transferred to Minerva; and Kasdorp, Shelden's tax advisor, states that he never gave tax advice to do so and that any idea that the arrangement was desirable for tax purposes was incorrect. Kasdopt testified that when he heard of what Starchild was claiming he "thought this matter a fantastic setup", which he "never believed ... happened."

This Court credits Shelden's and Kasdorp's testimony, and discredits Starchild's, taking into account not only the factors recounted above and below, but also the fact that Starchild has, at least once, been convicted and incarcerated for a felony involving dishonesty or false statements. He had a conviction in New Jersey on May 5, 1981, for "obtaining money under false pretenses" and "forgery", for which Starchild received a sentence of a minimum of one year and a maximum of two years on each count, with restitution ordered in full. In addition, Starchild has made misrepresentations to this Court, as set forth in this Court's order of December 15, 1983.

It is not credible that Shelden would agree to have the $1.7 million in assets in listed securities, which existed on December 15, 1977, transferred by way of loan to a company with no assets and with no security, especially to a company controlled by one who, at the time, was already refusing to give an accounting, thereby risking all his assets for the purported purpose of attempting to effect some tax savings.

As stated above, Holahan has testified that Starchild told him that he needed the money, and would not return it to the Trust. Glasser, a disbarred New York attorney upon whom Starchild relied and who advised Starchild concerning how to arrange the various transfers described above, has stated in a memorandum and orally that the purpose of the transfers was to conceal the money so it would not have to be paid back to the Trust, the alleged note to Minerva being entirely a sham.

Accordingly, the Court finds that the assets held by the New York brokerage houses of Donaldson, Lufkin & Jenrette; Bear, Stearns & Co., and Shearson/American Express, belonged to the Francis D. Shelden Revocable Inter Vivos Trust, and were wrongfully removed from the Trust by the TCVI and by Adam Starchild on December 15, 1977.

In addition, Starchild and the TCVI have failed to render an accounting and to provide records, both before and after institution of this suit. Even in response to an order of this Court to provide said records, they have refused to do so, preferring the consequence, after ample warning, of having their answer stricken, as recounted above. Starchild has testified that he had none, and never received any, records concerning Sogo Shosha when, in fact, such records were sent to him. As a result of each and all of the foregoing, the Court may and does infer that, had such an accounting and/or records been provided, they would have been unfavorable to the position of the TCVI and Starchild.

The financial investments expert brought by plaintiffs testified that the assets were worth $2,974,380.00 on February 15, 1985.

Based upon the foregoing Findings of Fact, the Court makes the following

## CONCLUSIONS OF LAW:

1. This Court has previously held that jurisdiction in this case is properly grounded on 28 USC 1332(a)(1), diversity of citizenship. (See Opinion and Order of Judge Toledo, January 15, 1979, and Opinion and Order of Judge Cerezo, April 6, 1982, and June 4, 1982.)

2. The lawful and proper trustees of the Francis D. Shelden Revocable Inter-Vivos Trust are L. Bennett Young and Comerica-Bank Detroit (formerly The Detroit Bank and Trust Company), as Second Successor Co-Trustees.[3]

3. L. Bennett Young and Comerica-Bank Detroit, as the lawful and proper trustees, are the rightful owners of the assets of the Francis D. Shelden Revocable Inter-Vivos Trust.

4. Defendant Adam Starchild was, at all times relevant to these proceedings, a Director of the Trust Company of the Virgin Islands Limited (TCVI), and was in most instances, the sole contact that the beneficiary, Francis D. Shelden and/or the Protector of the Trust, L. Bennett Young, had with the TCVI limited.

5. Defendant TCVI breached its fiduciary duty to the Francis D. Shelden Revocable Inter-Vivos Trust and to the Settlor and beneficiaries of said trust.

6. That a breach of said fiduciary duty occurred when defendants failed to keep a true and correct account of all receipts and disbursements made in connection with the administration of the trust.

7. That a breach of said fiduciary duty occurred when defendants failed to render statements of all such receipts and disbursements after a proper request was made by beneficiary Francis D. Shelden and by the Protector of the Trust.

8. That a breach of said fiduciary duty occurred when defendants failed to allow the Successor Trustee and the Protector of the Trust to have access to its books and records.

9. That a breach of said fiduciary duty occurred when the defendants failed to account annually for all the receipts and disbursements made to the income beneficiary.

10. That a breach of said fiduciary duty occurred when defendants opposed their removal as trustee and the replacement by a Successor Trustee.

11. That a breach of said fiduciary duty occurred when defendants failed to give a full disclosure statement and accounting to the Successor Trustee, the Settlor, and the beneficiaries.

12. The assets held by the New York brokerage houses of Donaldson, Lufkin & Jenrette; Bear Stearns & Company, and Shearson/American Express, belong to the Francis D. Shelden Revocable Inter-Vivos Trust since their inception, and at all times were and are the property of the Francis D. Shelden Trust, and these were wrongfully removed from the Trust by the TCVI and by Adam Starchild on December 15, 1977.

13. That prior to and at the time of the transfers of the assets of the Trust by TCVI and Adam Starchild, Adam Starchild was an owner, director and agent for the TCVI and was at all times acting in a fiduciary capacity.

14. That the transfers by Adam Starchild were made without the knowledge or authorization of the Settlor.

15. Adam Starchild knowingly and without lawful excuse transferred the assets out of the Trust.

16. That the transfers of the assets from the Trust were in pursuance of a plan conceived by Adam Starchild to place ownership and control of the assets into entities owned or controlled by Adam Starchild.

17. That the transfers from the Trust were made by or at the direction of the defendant Adam Starchild, to entities owned or controlled by defendant Adam Starchild, by false pretense, false representation and actual fraud.

---

**3.** See *National Bank of Detroit v. Francis D. Shelden,* 730 F.2d 421 (6th Cir.1984).

18. That the acts of defendant Adam Starchild were deceitful and were consciously intended to cheat the Trust, its Settlor and the Trust beneficiaries out of the value and benefits of the property transferred from the Trust.

19. That the transfers by TCVI and Adam Starchild were wrongful and without just cause.

20. That the transfers by TCVI and Adam Starchild were deliberate and intentional.

21. That the transfers by TCVI and Adam Starchild caused the injury suffered by the Trust, its Settlor and its beneficiaries.

22. That Adam Starchild owned, administered and operated the Trust Company of the Virgin Islands (TCVI), and was the individual responsible for the management and operation of said entity and is personally liable for the value of the assets which he administered and which he wrongfully removed from the Trust.

23. That the transferees of the Trust assets knowingly joined with TCVI and Adam Starchild in the breach of Trust.

24. The Civil Code of Puerto Rico states that a possessor in bad faith shall pay for the fruits collected and for those which the lawful possessor might have collected. Civil Code, Section 457, 31 LPRA 1470. Furthermore, a possessor in bad faith is in every case responsible for any deterioration. Civil Code Section 386, 31 LPRA 1472. Finally, acts relating to possession, either executed or agreed to by a person who possesses a thing belonging to another person merely as an occupant to benefit by or retain it for any reason, do not bind or obligate the owner, unless he has granted to the said occupant special authority to execute said acts, or shall subsequently ratify them. Civil Code Section 392, 31 LPRA 1478.

25. Having failed to account and thereby to show what deductions, expenses, and credits were or should be charged or taken in connection with the administration of the Trust, TCVI and Starchild are severally and jointly liable for the full present value of the assets placed in the Trust on or about September 28, 1976, namely, $2,974,380.00 plus interest since July 21, 1978.

26. By transferring the assets of the Trust into the foregoing entities, owned and controlled by Starchild, TCVI violated its fiduciary duties to the trust, which Starchild caused it to do, because such acts constituted self-dealing without the consent of the Settlor, and extreme recklessness in exchanging listed securities for the unsecured note of a company with no assets, and because of each of the said reasons. 31 LPRA 2573; Art. 866 Civil Code, 31 LPRA 2569; Art. 862 Civil Code.

27. The entities of Sogo Shosha Limited, British American Trust Company, Minerva Consulting Group, Inc., Minerva Investments Limited, Eleuthera Anstalt, Creative Foods, Farsee Limited, Atlas Financial, Keystone Farms, and British Financial Trust, took the funds received by them as recounted above, with notice of their having come from the Shelden Trust without the consent of Shelden, in breach by the TCVI of its fiduciary duty and/or as a conversion, and, consequently, said funds and their proceeds have, since they were received, belonged to and belong to the Trust.

28. The successor trustees, Comerica Bank and L. Bennett Young, and L. Bennett Young as Protector of the Trust, as true owners of the assets may recover the full amount of the assets of the trust, from the entities discussed above. Under Puerto Rico law, one who unjustly enriches himself at the expense of another, without cause, must restore such assets unjustly gained to its rightful owner. This principle of unjust enrichment is contained implicitly in the Civil Code. See Sections 381, 382, 383, and 384, 31 LPRA 1467–1470 as discussed above. See also, Guaroa Velázquez, *Las Obligaciones*, Section 228–247, pp. 133–142 (1964); M. Morales Lebrón, *Diccionario Justino*, Vol. 1, pp. 378–379 (1977).

In equity, in the Anglo-Saxon tradition, these entities would be said to be holding

these assets in "constructive trust" for the Shelden Trust. Allen, *Law in the Making (Unjust Enrichment)*, pp. 318, 329, Dawson, *Unjust Enrichment* (1951). The Supreme Court of Puerto Rico has accepted and applied both the concept of unjust enrichment under the Civil Code, and Constructive Trust. See, *Luperena v. Transportation Authority of P.R.*, 79 PRR 438 (1956); *Ramery v. Ramirez*, 65 PRR 510 (1946); *Ruiz v. Ruiz*, 61 PRR 794 (1943).

Therefore, since the third party corporate entities have received trust assets without knowledge that they were transferred in breach of trustee's duties, the assets rightfully belong to the Trust, and the Trust may recover those assets.

WHEREFORE, upon the above stated findings of fact and conclusions of law, the Clerk is instructed to enter judgment in favor of plaintiffs and against defendants.

SO ORDERED.